UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:14-cr-35 JD |
| | ) | |
| JEROME WHITE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

On May 12, 2014, the Defendant, Jerome White, by counsel, filed a Motion to Suppress [Doc. No. 16], seeking the suppression of the Defendant's statements made during a police interrogation and the results of a search of the Defendant's house. On June 12, 2014, the United States filed is Response to the Defendant's Motion to Suppress. [Doc. No. 20]. On June 27, 2014, the Defendant's Motion to Suppress was referred to the undersigned to conduct a hearing and issue a Report and Recommendation on the disposition of the Defendant's motion. [Doc. No. 21]. On July 8, 2014, the undersigned conducted an evidentiary hearing and heard the arguments of counsel on the Defendant's Motion to Suppress. For the reasons that follow, the undersigned now issues this Report and **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED**.

**I.   SUMMARY OF FACTS**

On February 11, 2014, South Bend Metro Special Operations Section ("MSOS") were conducting an investigation into a suspected heroin dealer, referred to herein as "Taylor." MSOS,

1

utilizing a confidential informant ("CI"), set up a controlled buy for 20 grams of heroin that was to take place on that date. There were several recorded telephone calls between CI and Taylor, in which the meeting place was changed. When police neared the meeting place, Taylor who was in his car, and believing that he was under surveillance, took off at a high rate of speed. Police gave chase. Taylor ultimately crashed into a snowbank. The Defendant Jerome White was a passenger in the car, and both Taylor and White took off running. A witness reported that one of the two possibly threw a gun away, but police were unable to locate any firearms in the vicinity. Police located a baggie containing approximately 0.1 grams of heroin in the driver's door, and no handgun was located in the car.

Defendant White was taken into custody and police conducted a recorded interview. Following advice of his *Miranda* rights, which White said he understood, White told investigators that the plan was to rob the CI and said he didn't see a gun and didn't throw a gun away. Although he has a 2011 conviction for distribution of controlled substances, he told investigators that he was no longer dealing. Investigators began pressing him on whether he was currently involved in dealing, telling White they had sales into him, but not personally. White claims that he responded "I don't have to say nothing." The United States argues that all he said was "I ain't saying . . ."

White made further statements, including that he and Taylor were going to cut a lesser amount of heroin by crushing up some pills and mixing it to make it appear that they were delivering 20 grams of heroin. He said that they got rid of the drugs during the chase.

Officers then began asking him about his home, telling him they wanted to search the house and asked White to sign a consent to search. White initially balked at signing, telling them

2

that they were going to "put more cases" on him. Officers told White, "I'm not putting more cases on you."

White then signed the consent to search. In the course of the search, officers found a bag of suspected heroin weighing approximately nine grams and a 9mm handgun, both of which were hidden in a heating vent. Police also found a Ruger handgun under an air mattress in White's

bedroom.

**II.     ANALYSIS**

A. Overview of the Admissibility of Confessions and Admissions

Generally confessions and admissions are admissible if made voluntarily. *United States v. Williams,* 128 F.3d 1128, 1131 (7th Cir. 1997). Voluntary statements follow from the use of rational intellect rather than as the result of physical abuse, psychological intimidation, or deceptive interrogation calculated to overcome the defendant's free will. *Watson v. Detella,* 122 F.3d 450, 453 (7th Cir. 1997); *United States v. Haddon,* 927 F.2d 942, 945 (7th Cir. 1991). Therefore, coercive police conduct renders a confession involuntary under the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *Watson*, 122 at 453.

To determine whether an admission or confession is voluntary, the court examines the totality of the circumstances and whether the statement was or was not the product of law enforcement coercion. *Watson,* 122 F.3d at 453. The use of deceit to obtain a confession does not necessarily make the confession involuntary, as long as it is not coercive. However, deceit is only one factor to be considered in the totality of the circumstances review of voluntariness.

*Frazier v. Cupp,* 394 U.S. 731, 739 (1969); *Sotelo v. Ind. State Prison,* 850 F.2d 1244, 1251 (7th Cir. 1988). The court distinguishes trickery from threats and promises, with the last two deemed unacceptable. *United States v. Kontny,* 238 F.3d 815, 817 (7th Cir. 2001). Thus, the court allows police to pressure and cajole, conceal material facts, and actively mislead. *Kontny,* 238 F.3d at 817 (citing *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990); *see, e.g., United States ex rel. Hall v. Dir., Dep't of Corr.,* 578 F.2d 194, 196 (7th Cir. 1978). The Seventh Circuit has also held that a law enforcement agent may actively mislead a defendant by playing on a defendant's guilt and fears as long as a rational decision remains possible. *United States v. Ceballos,* 302 F.3d 679, 694 (7th Cir. 2002) (finding confession voluntary even though officer falsely told defendant that another suspect had implicated him). Similarly in *United States v. Dillon,* 150 F.3d 754, 758 (7th Cir. 1998), the court held that a false promise of leniency may make a defendant's statement involuntary and inadmissible if it prevents a defendant from making a rational decision to confess.

B. <u>Re-Assertion of Fifth Amendment Right to Remain Silent</u>

Both the Defendant and the United States agreed at the suppression hearing that after being advised of his *Miranda* rights, a defendant may re-assert his right to remain silent if he unambiguously or unequivocally states his intention not to answer further questions. If he does so, the questioning must then stop. The requirement to end interrogation is scrupulously honored. *See Michigan v. Mosley,* 423 U.S. 96, 103 (1975). Or, stating the same standard differently, if a defendant's statement is ambiguous or equivocal, police are not required to end the interrogation. Therefore, a defendant's assertion of his Fifth Amendment right to refuse to answer questions must be sufficiently clear, unambiguous, or unequivocal. *See Davis v. United*

4

*States*, 512 U.S. 452, 461–62 (1994).

The central question the Court must address here is whether White, after being advised of his rights and after signing a waiver of his right to remain silent (Government's Exhibit #2), unequivocally or unambiguously reasserted his Fifth Amendment right to remain silent. If he did, the police were required to stop all further questioning. And if the police failed to stop, White's statements must be suppressed.

To address this question, the United States played the video and audio recording, (Government's Exhibit #1), of White's interrogation at the suppression hearing. However, although the recording was played more than once in court and several times more in chambers, the Court cannot determine what White said at all. Watching the video, it appears White is resting his head on his fist and against his cheeks and lips, which impairs his speaking. His voice is soft and his words are slurred.

In his brief and in his argument at the hearing, White's attorney claimed that White said "I don't have to say nothing." White testified at the hearing that he said, "I don't have to say nothing." The United States in its brief and argument at the hearing claimed that White only said, " I ain't saying . . ."

After again listening to the audio several times in chambers, the Court simply cannot determine with any certainty what White said. He could have said " I don't have to say nothing" but it is also possible that he said "I ain't saying." The very fact that whatever he said is in dispute is strong and convincing evidence that his statement falls far short of the clear, unequivocal, or unambiguous statement required to re-assert his right to remain silent. White's soft, muffled, and mumbled utterance can only be guessed at. It is not a clear and unambiguous

5

statement the law requires to force the police to stop their questioning.

Furthermore, even if the Court could conclude that White said "I don't have to say nothing" as he testified, it is not clear to what he was referring. Context is important. His statement appears more likely to be in response to the police officers' accusation that White had been selling drugs. As such, it would not be an invocation of his right to remain silent but rather a denial of the police officer's accusation. Again, the fact that the statement "I don't have to say nothing" is susceptible to two differing interpretations is further evidence that his statement is not clear, unequivocal, or unambiguous.

The Seventh Circuit has addressed similar cases and has found in those cases that the defendants' statements fell short of what the law required to re-assert their Fifth Amendment right to remain silent. In *United States v. Sherrod,* 445 F.3d 980, 982 (7th Cir. 2006), the Seventh Circuit held that a defendant who told interrogating police officers "I'm not going to talk about nothin" and "I'm not gonna talk about nothin—if you give me a picture of what's goin on, but I ain't gonna talk about shit" was not sufficient to invoke his Fifth Amendment right to remain silent. The court explained:

> Sherrod argues that his statements can only have meant one thing: he wanted the interview to end. But we agree with the district court. A suspect telling a police officer that he's "'not going to talk about nothin'" is as much a taunt—even a provocation—as it is an invocation of the right to remain silent. When Sherrod wanted to end the interview, he knew how to do it unambiguously. He didn't do so before he uttered his statements.

*Id.*; *see also United States v. Shabaz,* 579 F.3d 815, 819 (7th Cir. 2009) (applying the same standard that defendants must clearly, unambiguously, or unequivocally request counsel during an interrogation to invoke their Sixth Amendment right to counsel). Like the defendant's statement in *Sherrod*, White's purported statement, "I don't have to say nothing," is not an

6

invocation of the right to remain silent.

Therefore, because White's statement was not clear, unequivocal, or unambiguous, the police officer was not required to stop the interrogation. White's subsequent statement should not be suppressed.

    C. <u>Consent to Search White's House</u>

White does not fare any better with his argument that his consent to search his house was involuntary because he was relying on false promises of the police officer that no additional charges would be brought against him if he consented to the search. White relies upon an Eighth Circuit opinion, *United States v. Quintero,* 648 F.3d 660, 667 (8th Cir. 2011) to support the proposition that the court should consider the totality of the circumstances, including personal traits of the defendant and the environment in which the consent was obtained. White then tries to draw parallels to the admittedly non-exhaustive list of factors in *Quintero* to his situation. His analysis fails, however, after comparing unique facts of this case to the facts in similar Seventh Circuit cases.

As to the facts surrounding his consent, White says that he agreed to allow police officers to search his home because the interrogating officer promised him no additional charges would be filed against him if anything was found at his home. A review of the video recording of the interrogation confirms that White expressed his concern to the police officer that he was "trying to put cases on him." However, White's argument that his consent was involuntary fails for the simple reason that the police officer never promised any specific result. The interrogating officer only stated that he would bring White's cooperation to the attention of the prosecutor as revealed through the audio recording of the interrogation. Admittedly, the police officer offered

7

White assistance with the prosecutor on several occasions. Nevertheless, the officer specifically told White that he "was not guaranteeing anything" and that the final decision on charging was not his but the prosecutor's. Despite White interpretation, the officer's statement was not a promise or bargain. It was merely a factual statement that if White cooperated, the police officer would inform the prosecutor of his cooperation. There were no promises or guarantees.

The Seventh Circuit has reached the same conclusion in similar cases. In *United States v. Charles,* 476 F.3d 492, 494–95 (7th Cir. 2007), a Milwaukee detective told the defendant he might be able to receive favorable treatment from the state if he admitted certain conduct, which the defendant did. Unfortunately, the case, like White's, ended being prosecuted by the federal government, who did not provide the consideration defendant felt he had been promised. Charles argued that his statements were involuntary because they were made as the result of the promised favorable treatment. The Seventh Circuit, however, rejected his argument. The court reasoned that the detective had not overborne the defendant's will or coerced him to make his incriminating statement. As a result, the court held that the promise to seek favorable consideration did not undercut the voluntariness of the confession.

In *United States v. Villapando,* 588 F.3d 1124, 1126–27 (7th Cir. 2009), an arresting officer found marijuana in the defendant's car. The defendant was on probation at the time. Like the officer who interrogated White, the police officer in *Villapando* was more interested in the defendant's cooperation and so offered to intercede with the defendant's probation officer. This led the defendant to make admissions of more serious conduct. The defendant then argued that his statements were not voluntary. The Seventh Circuit noted that while false promises of leniency may render a statement involuntary, tactics short of false promises are usually

8

permissible. *Id.* at 1128. A defendant arguing a false promise must establish that his interrogator made a promise that was materially false and sufficient to overbear his free will. The court distinguished such promises from deceptive police practices, because a false promise has a unique potential to cause someone to speak irrationally and unreliably. False promises can "realign a suspect's incentives" *vis a vis* making a rational choice. *Id.*

Like Villapando, White did not meet this burden. The police officer interrogating White did not make a promise that was materially false or sufficient to overbear White's free will that led him to consent to a search of his house.

Similarly in *United States v. Rutledge,* Judge Posner wrote for the court

> . . . if the officers had merely promised Rutledge to inform the prosecutors of his cooperation, or had stated that, other things being equal, cooperation is helpful to an accused, or had reminded him that while cooperation might help him the government would not hesitate to use anything he said against him, there could be no serious argument that he had been coerced to confess. . .
>
> [The] Government is not forbidden to "buy" information with honest promises of consideration. (citations omitted) . . .   The government was not required to tell him that if he was wise he would shut up because it had no other source of information about the extent of his illegal activities. The policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible. . .
>
> Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead–all up to limits not exceeded here.

*Id.* at 1130–31 (citing *United States v. Guerrero,* 847 F.2d 1363, 1366–67 (9th Cir. 1988)).

Here, as in *Rutledge, Villapando*, and *Charles*, White exercised his free will and consented to the search of his house. The police officer promised him only that he would inform the prosecutor of his cooperation. He did not promise specific results. While the police officer

9

may have played upon White's anxieties, fears, and uncertainties, he did not go beyond what the law allows. A careful review of the audio recording of White's interrogation reveals that White knew what he was doing, gave his voluntary consent, and assisted the police with the search. His free will was not overcome by the police officer's promises. That he may now have remorse for his decision to cooperate is simply not sufficient to vitiate his consent or to require the suppression of either his statements or the fruits of his consented search.

## III. CONCLUSION

Because White did not clearly, unambiguously, or unequivocally re-assert his right to remain silent, the police officers were not required to halt their interrogation and White's statements should not be suppressed. Similarly, because the police officer did not promise White anything more than letting the prosecutor know of his cooperation, White's consent to search his home was voluntary and the items found there should also not be suppressed.

It is therefore **RECOMMENDED** that the Defendant's Motion to Suppress [Doc. No. 16] should be **DENIED**.

> **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

**SO ORDERED.**

Dated July 16, 2014.

                                                  S/Christopher A. Nuechterlein
                                                  Christopher A. Nuechterlein
                                                  United States Magistrate Judge