UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:14-CR-035 JD |
| | ) | |
| JEROME WHITE | ) | |

OPINION AND ORDER

This matter comes before the court on Defendant Jerome White's objection to factual and legal determinations in the Report and Recommendation [DE 26] from Magistrate Judge Christopher A. Nuechterlein denying the motion to suppress after conducting an evidentiary hearing. Upon *de novo* review of the objections made,[1] *see* 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), the undersigned hereby ADOPTS the Report and Recommendation insofar as it denies the motion to suppress, but does so on the facts determined herein.

In sum, the motion to suppress is denied because the Government has met its burden in proving by a preponderance of the evidence that White knowingly and voluntarily waived his *Miranda* rights, and did not unambiguously invoke his right to remain silent. *See Colorado v. Connelly*, 479 U.S. 157, 167-68 (1986); *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008) ("The government bears the burden of demonstrating the admissibility of a confession . . . by a preponderance of the evidence") (citations omitted). Moreover, the government has shown that White's consent to search his home was voluntarily and knowingly given. *See United States v. Matlock*, 415 U.S. 164, 177, 177 n.14 (1974) (requiring that the Government bear the burden of demonstrating the admissibility of evidence resulting from a warrantless search by a

---

[1] Even employing a clear error standard to the factual determinations, as suggested in defense counsel's brief [DE 28] and which would be the standard on appeal, *see United States v. Buenaventura*, 622 F.3d 761, 774 (7th Cir. 2010), the result of the undersigned's determinations would not change.

preponderance of the evidence). As a result, the items found during the search of White's home need not be suppressed.

## I. FACTS

The events pertinent to the suppression motion occurred while White was in custody and interrogated at the South Bend Police Department on February 11, 2014 by South Bend Police Officer Rafino Gayton and Sergeant Beckham[2] of the Metro Special Operations Section (MSOS), relative to an aborted controlled buy of 20 grams of heroin from a suspected heroin dealer, Demetrius Taylor.

After several recorded telephone calls between a confidential informant ("CI") and Taylor, the meeting place was set for the buy to occur on February 11th. On that day, as police neared the meeting place, Taylor believed that he was under surveillance and took off in his vehicle at a high rate of speed. With police chasing him, Taylor crashed into a snowbank. The Defendant Jerome White was a passenger in Taylor's car, and both Taylor and White fled on foot. A witness reported that one of the two possibly threw a gun away, but police did not locate any firearms in the vicinity. However, in Taylor's vehicle, police located a baggie containing approximately 0.1 grams of heroin in the driver's door. No guns were found in the vehicle.

Once apprehended, White and Taylor were taken into custody and interviewed. White's interrogation was recorded by audio and video.[3] Following advice of his *Miranda* rights, which

---

[2]In reality, Sergeant Beckham was not present for much of the interrogation, but rather came and went throughout.

[3]The DVD of the recording was admitted without objection during the suppression hearing. Neither counsel submitted transcriptions of the almost hour long interrogation, because only one passage of the recording is disputed. The undersigned has reviewed the recording [Gov.'t Exb. 1].

White said he understood,[4] White told investigators that the plan was for him to be the watch-out while a heroin exchange took place. In reality, Taylor and White intended to rob the CI, but White denied knowing whether a gun was present.

White also admitted to having a previous conviction for possessing, delivering and manufacturing crack in the State of Michigan, but he told the officers that he was no longer dealing. Officer Gayton did not believe White, and so (at about the nineteen minute mark of the interrogation[5]) began pressing White on whether he was currently involved in dealing:

    MSOS: When was the last time you sold anything?

    White: I ain't sold nothing.

    MSOS: That's not what I, obviously you did sell something because you got arrested and charged with it, right, convicted?

    **(19:10:46)** White: Oh yeah, so you're talking about Cincinnati.

    MSOS: Yeah. So when was the last time you sold anything?

    White: Nothing.

    MSOS: Because you're hungry right-

    White: Been a long time-

    MSOS: You don't work and you're hungry right-

    White: Yeah-

    MSOS: And you're the man of the house and you want to make sure there is f[]king money coming in the house-

---

[4]Officer Gayton read White his *Miranda* rights and then handed White a written copy of those rights. White explicitly acknowledged his understanding of his *Miranda* rights and then waived those rights by signing the waiver of rights form [Gov't Exb. 2].

[5]The times noted herein refer to the clock on the video, located at the top-left of the screen when playing the recording.

White: And I'm dependent on my wife right now.

MSOS: And you're dependent on your wife, you ain't never sold nothing?

White: You talking about since then?

MSOS: Yeah.

White: Yeah, I ain't sold nothin.

MSOS: Yeah. You ain't selling nothin. So you couldn't call on your people right now and be like 'hey man, hey, let me get a zip?' you couldn't do that?

White: Nah I mean if I wanted to, I could.

MSOS: But when was the last time you did it? Because you don't stop. I can tell you didn't stop, I bought from you. Like not me personally.

White: You bought from me?

MSOS: Yeah.

White: Nah, you didn't buy from me.

**(19:11:30)** MSOS: I didn't? You sure about that?

White: Yeah, when did you buy something from me?

MSOS: That's for me- are you 100% sure I didn't get shit from you?

White: **I don't have to say anything-**[6]

MSOS: Not me personally. Maybe I had somebody do it for me. How do you know? You don't. Because you've been selling. And I know that. And I just want you to be honest. It ain't a trick bag. It's honesty, and your honesty goes a

---

[6]This response from White represents the only contested portion of the recorded interrogation at issue. During the suppression hearing, Defendant White testified that he told officers he didn't deal and he then stated "I don't have to say nothing." [DE 27 at 29-30]. The magistrate judge concluded he could not determine with certainty what White said, and even assuming White said "I don't have to say nothing", this phrase was susceptible to two interpretations and thus, not clear, unequivocal, or unambiguous [DE 26 at 5-6]. Defense counsel objects to this finding and claims that White clearly responded "I don't have to say anything." [DE 28 at 3]. The Government argues that White only said "I ain't saying . . .".

4

> million miles in this room. It holds a lot of weight with me, and you're not being honest. See what I'm saying? So when was the last time you sold? Just throw it out there man. You already told on yourself. You were going to be part of the robbery. That's the worst thing that could happen to you right now.

Officer Gayton then explained that he was not trying to put White in a "trick bag," rather, he was trying to figure out what value White had for the police **(19:12:40)**. Officer Gayton stated that he had the "unique opportunity" to help White out, by allowing White to cooperate with the police. But White had to be completely honest and "man up" with everything he had done. However, Officer Gayton made clear that he would not give White another opportunity to be honest, and he would not even call the prosecutor if he didn't think White "manned up" to everything. Officer Gayton also explained that the prosecutor would ultimately decide if the police could work with White and determine how much White's cooperation would help offset his case. At this point, White confirmed with a nod of the head that he wanted to talk to Officer Gayton and take advantage of the opportunity **(19:18:49)**.

Officer Gayton told White to first address the remaining details of his involvement with Taylor and the heroin exchange. White indicated Taylor contacted him about the exchange. Because White had 5 or 6 grams of heroin, he was going to give it to Taylor so they could cut a lesser amount of heroin by crushing up some pills and mixing it to make it appear that they were delivering 20 grams of heroin. White admitted that once police gave chase, he tossed the dope out of the door. He still denied having any gun.

Officer Gayton then indicated that since White had "manned up" to his involvement with the heroin exchange, he now needed to admit what contraband (drugs or guns) was back at the house that police needed to go and confiscate **(19:25:05)**. White responded that nothing was at his house. Officer Gayton again reiterated that this discussion was related to the "opportunity"

5

that White had to work with police, and that Officer Gayton could not vouch for White to the prosecutor if White was not credible. Officer Gayton told White "this is testing your credibility . . . I'm not putting more cases on you." **(19:26:03)**. Officer White explained that if White would admit to having guns and drugs in the house, or whatever else was there, then police would go confiscate it and "move on." **(19:26:20)**. But White continuously maintained that there was nothing at the house and he was not aware of the presence of any guns or drugs. Despite his repeated denials, White balked at signing the consent to search form. Officer Gayton said he didn't think White was being honest and so he would skip discussing the house for now, but he would return to it later because it was apparent that something in the house was important to White.

Officer Gayton again reminded White that his credibility was still being tested and that White needed to "man up" by admitting everything, including disclosure of information about those who provided White's drugs **(19:28:43-19:30:35)**. Officer Gayton reiterated that with all of the information provided by White, he could then decide whether to contact the prosecutor in order to receive permission to work with White. White hesitated and said he didn't want to go to jail. At that point, Officer Gayton explicitly notified White that if police wanted him in jail it could have already happened given his initial confession to the intended robbery and heroin exchange. Officer Gayton indicated that jail remained a possibility and he did not know if it would be a federal or state case, but he still wanted to work with White. White explicitly indicated he wanted to take advantage of the opportunity to help himself out **(19:31:02)**, and he then provided the details about his drug suppliers.

Officer Gayton never returned to discussing White's consent to search his house. Just before concluding the interrogation Officer Gayton left the room, and Sergeant Beckham returned. Sergeant Beckham asked White whether the house had been covered and whether White had a gun at the house **(19:45:23)**. Again White denied having anything at the house. The interrogation concluded shortly thereafter, around 7:45 p.m. **(19:47:30)**.

Officer Randall Goering of the South Bend Police Department's MSOS testified at the suppression hearing that after White's interrogation, he and Sergeant Lara explained the consent to search form to White [DE 27 at 22-23]. Officer Goering indicated that White did not have any concerns about his home being searched, and White signed the form.[7]

When Officer Goering and Sergeant Lara searched the home with White present, they found a bag of suspected heroin weighing approximately 9 grams and a 9 mm handgun, both of which were hidden in a heating vent [DE 27 at 44]. Police also found a Ruger handgun under an air mattress in White's bedroom. White was allowed to stay at his home that evening after the search.

Ultimately, White was indicted for possessing with intent to distribute heroin, possessing a firearm in furtherance of a drug trafficking crime, and possessing one or more firearms as a felon, all occurring on or about February 11th of this year.

During the suppression hearing, Defendant White testified that he did not know Taylor was going to deal heroin on the day in question and he had not dealt heroin in the past [DE 27 at 35-37]. White also testified that when responding to Officer Gayton's questions about drug dealing, he first indicated that 'he didn't deal' and then he said "I don't have to say nothin,"

---

[7]The consent to search form was admitted at the suppression hearing without objection [Gov't Exb. 3].

7

which, per White, meant that he did not want to talk anymore [DE 27 at 29-30]. White said the officers kept asking him questions and made him believe that if he did not cooperate then he would be going to jail [DE 27 at 30]. White also said he believed that when Officer Gayton indicated that he was not 'putting anything else on' White and that they would just 'move on,' meant no additional charges would be brought for anything found in the house [DE 27 at 31]. White testified that the reason he did not want officers going to his house was because he "didn't have nothing at the place that was going on." [DE 27 at 31]. White said he ultimately signed the consent form because he did not think he would be charged with anything found in the home [DE 27 at 32]. White denied cooperating with the police during the search and claimed he did not even know about the drugs and guns [DE 27 at 33-34, 37-39].

The parties do not dispute that White was in custody for *Miranda* purposes, and that White made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.[8] *See Edwards v. Arizona*, 451 U.S. 477, 482-83 (1981). And the undersigned now resolves the dispute concerning White's response and concludes that White stated, "**I don't have to say anything-**" or "**I don't have to say nothing-**", as defendant contends.[9] *See United States v. Mills*, 122 F.3d 346, 350 (7th Cir. 1997) (to determine the content of the response the court asks: "Under the totality of the circumstances, what was the message that [the defendant] wished to convey?").

Given this finding, the question is whether White's statement unambiguously invoked his right to remain silent during the course of the interrogation. If he did, then any responses to

---

[8]Counsel for White has consistently maintained the position throughout briefing and argument that White knowingly and voluntarily waived his *Miranda* rights.

[9]Admittedly, the undersigned had to listen to the recording multiple times to discern White's actual response which is soft and muffled by his hand.

8

further questioning which should have ceased are inadmissable and must be suppressed. Moreover, defense counsel argues that his subsequently provided consent to search and the objects found during the search would be inadmissable as "fruit of the poisonous tree." The remaining issue is whether White's consent to search his residence was involuntary because it was based on an alleged false promise by Officer Gayton that White would not be further charged based on evidence found at his home. The Government admits that the propriety of the home search, depends solely on whether White's consent was given voluntarily.

## II. ANALYSIS

### A. Fifth Amendment Right to be Silent

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Anyone "questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

Under *Miranda*, an interrogation must immediately cease when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." 384 U.S. at 473-74. Statements elicited by police after a defendant invokes this right are inadmissible. *See Michigan v. Mosley*, 423 U.S. 96, 100-01 (1975). To come within the ambit of this rule, however, a suspect's invocation of his right to remain silent must be unambiguous. *Texas v. Cobb*, 532 U.S. 162, 176 (2001) (Kennedy, J., concurring) ("Where a required *Miranda*

9

warning has been given," a suspect's incriminating statement "is suppressed to protect the Fifth Amendment right of silence only if a reasonable officer should have been certain that the suspect expressed the unequivocal election of the right.").

The United States Supreme Court reaffirmed this standard in *Berghuis v. Thompkins*, 560 U.S. 370 (2010). In *Thompkins*, it was determined that silence does not invoke the right to remain silent; instead, a suspect must "unambiguously" invoke his *Miranda* rights. *Thompkins*, 560 U.S. at 381-82 ("A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and ... provide[s] guidance to officers" on how to proceed in the face of ambiguity.") (citing *Davis*, 512 U.S. at 458-59). Justice Kennedy, writing for the majority, indicated that Thompkins, after remaining silent for almost two hours and forty-five minutes, "would have invoked his 'right to cut off questioning'" had he said "that he wanted to remain silent or that he did not want to talk to the police." *Id*. at 382 (citation omitted).

Turning to the present case, White argues that the officers interrogating him did exactly what *Miranda* prohibits. While White admits that he initially consented to speaking with the officers, he believes that his statement that "I don't have to say anything-" or "I don't have to say nothing-", unambiguously invoked his right to remain silent. Therefore, White argues that any statements and his consent to search which followed this invocation of his rights, must be suppressed.

The Government argues there is no basis to suppress White's statements because his supposed invocation, in the context of his denying other drug dealing, did not constitute an unambiguous expression of his right to remain silent.

10

First, the parties agree, and the Court finds, that White's waiver of his *Miranda* rights was knowing and voluntary. *See Thompkins*, 560 U.S. 370, 382-83 (the waiver must be the product of free and deliberate choice rather than intimidation, coercion, or deception, and the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it) (citing *Moran v. Burbine*, 475 U.S. 412 (1986)). There is no contention that White did not understand his rights, and from this it follows that he knew what he gave up when he spoke. This determination is made based on the facts that White was provided a written copy of his *Miranda* warnings after being advised of those rights by Officer Gayton, explicitly acknowledged understanding them, and voluntarily signed a waiver. Thereafter, White answered the officer's questions concerning his part in the planned heroin exchange and robbery, and engaged in a discussion and course of conduct indicating waiver. Furthermore, during the course of the interrogation, White was never made to feel threatened or coerced in any manner.[10] The interrogation was conducted in a standard interview room by two officers in the early evening, it was approximately one hour long, and there were no circumstances present indicating that coercive tactics were employed. As a result, White knowingly and voluntarily waived his right to remain silent.

Second, based on the recorded interrogation and facts presented, the Court finds that White's response, whether "I don't have to say anything-" or "I don't have to say nothing-",

---

[10]The fact that White testified to believing he might go to jail if he didn't cooperate, does not render his waiver (or his subsequent consent to search) involuntary, because being forced to choose between unpalatable options does not constitute coercion. *See United States v. Alexander*, 573 F.3d 465, 477–78 (7th Cir. 2009) (an officer's factually accurate statement that police will take lawful investigative action in the absence of cooperation is not coercive conduct); *United States v. Miller*, 450 F.3d 270, 272–73 (7th Cir. 2006) (a choice between cooperation and freedom, on the one hand, and silence followed by custody and prosecution, on the other, is a common one), *abrogated on other grounds, Kimbrough v. United States*, 552 U.S. 85 (2007).

when coupled with the circumstances of the interrogation and White's conduct, were not sufficiently clear to invoke his right to remain silent. *See Thompkins*, 560 U.S. 370 at 381 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). Here, White was provided *Miranda* warnings, expressly waived his *Miranda* rights, and proceeded to cooperate in answering questions for over fifteen minutes. When Officer Gayton began questioning White about his history of drug dealing, White continued to voluntarily offer responses, denied any dealing, and did not change his demeanor. When Officer Gayton specifically asked White whether he was confident he did not deal drugs with the police, White indicated he didn't have to say anything (or nothing).

In making this comment, White's behavior and mannerisms did not change—he remained stoic before, during, and after this response. White did not hesitate nor use any more conviction in indicating that he had nothing to say, than he used with other responses. A reasonable officer under the circumstances would have placed no more significance on this particular response, than any other response given by White throughout the duration of the interrogation. Moreover, even after making the comment, White evidenced an intent to continue the interrogation, and engaged in further discussion with Officer Gayton concerning his limited role in the robbery as the look-out. Shortly thereafter **(19:18:49)**, Officer Gayton confirmed whether White wanted to keep talking, to which White nodded his head yes. Therefore, no circumstances suggested White no longer wanted to talk to police when White indicated he had nothing to say in response to one of Officer Gayton's questions.

The Seventh Circuit has also found phrases similar to White's response to be ambiguous and insufficient to invoke the right to remain silent. In *United States v. Sherrod*, 445 F.3d 980,

12

982 (7th Cir. 2006), the suspect's statements "I'm not going to talk about nothin" and "I'm not gonna talk about nothin'—if you'd give me a picture of what's going on, but I ain't gonna talk about shit" were held to be ambiguous, "as much a taunt—even a provocation—as it [was] an invocation of the right to remain silent". And in *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir. 1996), it was determined that defendant's response of "I don't got nothing to say," standing alone, could be construed as an invocation of the defendant's right to remain silent, or, when placed in the context of the defendant's other comments, it could also be interpreted as merely an angry response to the *Miranda* waiver form placed in front of him. Given the two possible interpretations, it was held that Bank's statement, when considered in context, was not a clear, unambiguous assertion of his right to remain silent. *Banks*, 78 F.3d at 1197, *vacated on other grounds*, *Mills v. United States*, 519 U.S. 990 (1996).[11]

It is true that the defendants in *Sherrod* and *Banks* made their equivocal statements immediately after their *Miranda* rights were explained; whereas, White had been answering questions for almost nineteen minutes before commenting that he had nothing to say. This fact, contrary to defense counsel's argument, actually supports the court's finding that White's response was ambiguous, because nothing about White's response (either his words/actions or their context) should have alerted the officer to the fact that White had suddenly changed course and was attempting to invoke his right to silence. White's response, that he didn't have to say anything (or nothing), standing alone, could be construed as an invocation of his right to remain silent. Yet, when placed in the context of the interrogation, the alternate interpretation—that it

---

[11]*Mills* involved determining the proper appellate standard of review to be employed when reviewing findings of reasonable suspicion to stop and probable cause to search. *United States v. Mills*, 122 F.3d 346 (7th Cir. 1997).

13

was merely a response to Officer Gayton's accusation that White had sold drugs to others working for the police—is also reasonable (and more likely given the previous denial of dealing drugs). Given these two possible interpretations, White's statement, when considered in context, was not a clear, unambiguous assertion of his right to remain silent, and an ambiguous invocation of the right to remain silent does not require that the police cease all questioning.

Recognizing that there are no magic words that a defendant must use in order to invoke his *Miranda* rights, in light of the totality of the circumstances of this case, the officers were not required to guess how to proceed in the face of White's ambiguous response. To conclude White invoked his right to remain silent on this record would be "[t]reating an ambiguous or equivocal . . . statement as an invocation of *Miranda* rights" which would "place a significant burden on society's interest in prosecuting criminal activity." *Thompkins*, 560 U.S. at 382.

In sum, White received and understood his *Miranda* warnings, waived the right to remain silent by making informed and uncoerced statements to the police, and did not unambiguously invoke his *Miranda* rights thereafter.

**B.**     **Fourth Amendment Right to be Free from Unreasonable Search and Seizure**

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. While a warrantless entry for the purpose of conducting a search ordinarily violates the Fourth Amendment, *see Payton v. New York*, 445 U.S. 573, 585 (1980), a well settled exception to this general rule permits authorities to conduct a search without a warrant if they obtain voluntary consent from the individual whose property is to be searched. *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir. 1995). The

burden is on the Government to prove, by a preponderance of the evidence, "that someone who consents to a search does so freely and voluntarily." *Id*. (citations omitted). "The existence of voluntary consent is a question of fact to be determined based on the totality of the circumstances." *United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010) (quoting *United States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007)). In making this determination, among the relevant factors to consider are:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.

*United States v. Villegas*, 388 F.3d 317, 325 (7th Cir. 2004) (quoting *United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001)).

In addition, trickery, deceit, even impersonation by law enforcement do not overcome a suspects voluntariness, unless government agents make threats or promises. *Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (holding: "Although 'the law permits the police to pressure and cajole, conceal material facts, and actively mislead,' it draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free") (internal quotation omitted); *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (discussing how trickery, deceit, and impersonation do not undermine the voluntariness of a confession, unless the agents make threats or promises); *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) (holding that "[f]ar from making the police a fiduciary of the suspect,

15

the law permits the police to pressure and cajole, conceal material facts, and actively mislead"). And given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him. *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009).

Defense counsel argues White's consent to search was involuntary due to the circumstances of the interrogation and because White relied on statements by Officer Gayton that he was "testing [White's] credibility" and "not putting more cases on [White]." The argument goes, that these statements, coupled with Officer Gayton's seeking White's cooperation on other matters and needing to test his credibility for that cooperation, resulted in White's false belief that the consent to search would not result in further charges and was necessary to continue his cooperation (although White denied cooperating during the search).

The magistrate judge concluded that White's argument fails for the simple reason that the police officer never promised any specific result, rather White's cooperation would be brought to the attention of the prosecutor who would make the final decision about the charges to bring.

Relative to the above factors and the circumstances of the interrogation, White was in his mid-twenties, married, reasonably mature and intelligent, and certainly had familiarity with the criminal justice system. White had been advised of his *Miranda* warnings which he explicitly waived. Although White was in custody, he was interrogated by only two officers (at most) for just under an hour in the evening. And while White initially balked at signing the consent form, during the interrogation he continued to deny that there was anything back at the house that he was concerned about. Testimony by White that he was threatened by police during the interrogation is not borne out by the recording. Instead, the officers acted in a professional

16

manner and more than once verified that White wanted to continue talking and taking advantage of the opportunity to help himself. Once the issue of consent was raised and dropped shortly thereafter, it did not come up again during the interrogation and White did not sign the form before the interrogation's termination. In getting White to sign the consent shortly after his interrogation, there was also no evidence of coercion. Rather, the evidence submitted indicated White seemed unconcerned about signing the form once it was read and explained to him by Officer Goering. Ultimately, nothing about the environment of the interrogation suggests that White didn't consent to the search freely and voluntarily.

Relative to Officer Gayton's interrogation statements that he was not 'putting more cases on' White and that police would just 'move on'—once these two statements are put in context, it is clear Officer Gayton did not make a promise which was broken when charges resulted from undisclosed contraband subsequently found at the home.

Assuming for the moment that Officer Gayton offered not to add additional charges, White didn't act on the offer. When the subject of the consent to search White's home was broached, Officer Gayton explained that if White would *admit during the interrogation* to having guns or drugs in the house, they would confiscate them and just move on. Yet, during the interrogation, White did not make these admissions; rather, he continued to deny that his home contained any guns or drugs.[12] Therefore, even if Officer Gayton had indicated that no further cases would be brought on account of disclosures made to him during the interrogation, or that might result from things confiscated at the home, White failed to accept any such offer by

---

[12]Even to this day, White denies knowing anything about the guns and drugs that were recovered from his home.

17

making those continuing denials. The officers only discovered the guns and drugs by conducting the search.

However, if White's ultimate consent to the search of his home was a product of the interrogation and White's agreement to cooperate, as argued by the defense, Officer Gayton never made false promises during the course of the interrogation. White did not consent to the search immediately after Officer Gayton suggested that more cases wouldn't be put on White. It was not until after the interrogation ended, that White had his rights explained to him by another officer, when White consented to the search. Therefore, in considering the context in which White ultimately gave consent, the entirety of the interrogation must be considered.

Officer Gayton made clear, during the *same* discussion concerning the search of White's home, that he ultimately had to go to the prosecutor and vouch for White, which Officer Gayton was unwilling to do unless White manned up and showed he was credible. Officer Gayton explained numerous times that if White was credible, then Officer Gayton would talk to the prosecutor and the prosecutor would ultimately decide if the police could work with White and determine to what extent White's cooperation would off-set his criminal conduct **(19:14:30-19:18:50, 19:25:23, 19:28:47, 19:30:00)**. In fact, *after* commenting that he was not putting more cases on White, Officer Gayton referred to the prosecutor no less than three times—indicating that he would have to present White's cooperation to the prosecutor in charge of prosecuting the case **(19:28:47, 19:30:00, 19:37:40)**.[13] And, at one point **(19:35:30)**, White told Officer Gayton that he wanted to make "this shit disappear," to which Officer Gayton

---

[13]These statements were consistent with Officer Gayton's explicit warnings earlier in the interrogation that he could not "guarantee" White anything, but the prosecutor had the final decision on how to prosecute the case **(19:14:00, 19:16:07-19:18:20)**.

confirmed he could not promise anything, nor did he even know whether White's case would be a federal or state case.

Thus, when considered in context, Officer Gayton did not lie and never affirmatively stated that White would not face charges if a search of his home led to the discovery of guns and drugs. *See, e.g., United States v. Biggs*, 491 F.3d 616, 623 (7th Cir. 2007) (considering the totality of the circumstances, defendant's mistaken belief that he would be released if he turned over guns does not render his consent to search involuntary). Instead, Officer Gayton's statements did nothing but indicate a promise to bring White's cooperation to the attention of the prosecutor who controlled the fate of the prosecution. *See, e.g., United States v. Villalpando*, 588 F.3d 1124, 1128–30 (7th Cir. 2009) (reasoning that the statement "we don't have to charge you" did not represent a solid offer of leniency, and noting that it is far different for a detective to offer to intercede on someone's behalf than to promise that such an intercession would be effective); *United States v. Charles,* 476 F.3d 492, 497 (7th Cir. 2007) (promises—particularly honest ones such as the detectives—to bring cooperation by the defendant to the attention of prosecutors do not render a confession involuntary). Thus, given the totality of the circumstances, it cannot be said that the officers made a promise that was materially false and sufficient to overbear White's free will, nor that the circumstances of White's interrogation were sufficient to render his consent involuntary. *See United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) (noting that officers "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they are just not allowed to magnify those . . . to the point where rational decision becomes impossible.").

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant Jerome White's Motion to Suppress [DE 16] and ADOPTS the magistrate judge's Report and Recommendation in this respect based on the determinations made herein. The trial date of November 3, 2014 to be held in South Bend at 9:30 a.m., is CONFIRMED.

SO ORDERED.

ENTERED: October 10, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court